LOUIS P. PETRICH (State Bar No. 038161)
DONALD R. GORDON (State Bar No. 089741)
DANIEL M. MAYEDA (State Bar No. 108543)
LEOPOLD, PETRICH & SMITH, P.C.
2049 Century Park East, Suite 3110
Los Angeles, California 90067-3274
Telephone:  (310) 277-3333
Facsimile:   (310) 277-7444
Email:  lpetrich@lpsla.com

Attorneys for Defendant
Adam Spiegel, aka Spike Jonze

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Sachin Gadh and Jonathan Sender,<br><br>Plaintiffs,<br><br>v.<br><br>Adam Spiegel aka Spike Jonze,<br><br>Defendant. | **CASE NO. 2:14-CV-00855 JFW (PJW)**<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS BY DEFENDANT ADAM SPIEGEL, AKA SPIKE JONZE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Request for Judicial Notice filed concurrently; Notice of Lodging, Proposed Order and Submission of Unpublished Opinion lodged concurrently]<br><br>**DATE:       March 31, 2014**<br>**TIME:       1:30 p.m.**<br>**CTRM:       16**<br><br>(U.S. District Judge John F. Walter) |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ...................................................................................... 1

    A.    Allegations of Complaint .................................................................. 2

    B.    Legal Standard .................................................................................. 2

    C.    A Court May Dismiss a Copyright Claim for Lack of Substantial Similarity on a Rule 12(b)(6) Motion ............................................... 3

    D.    The Court May Take Judicial Notice of the Two Works .................... 3

    E.    Summary of Defendant's Motion Picture *Her* ................................ 4

    F.    Summary of Plaintiffs' Script "Belvedere" ...................................... 9

II.   THE COPYRIGHT CLAIM ..................................................................... 12

    A.    Unlawful Appropriation ("Substantial Similarity of Protected Expression") ................................................................................... 13

    B.    Extrinsic Test .................................................................................. 14

        1.    No Similarity as to Plot and Sequences of Events ................... 15

        2.    No Similarity as to Characters ................................................ 16

        3.    No Similarity as to Themes ..................................................... 18

        4.    No Similarity as to Settings .................................................... 18

        5.    No Similarity as to Mood ........................................................ 19

        6.    No Similarity as to Pace ......................................................... 19

        7.    No Similarity as to Dialogue ................................................... 19

III.  PLAINTIFFS' CONTENTION THAT *HER* IS DERIVATIVE OF "BELVEDERE" CANNOT AVOID DISMISSAL ..................................... 20

IV.   CONCLUSION ........................................................................................ 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Architecture, LLC v. Simone Development Corp.*,
  602 F.3d 57 (2d Cir. 2010) ........................................................... 3

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ........................................ 2

*Benay v. Warner Bros. Entertainment, Inc.*,
  607 F.3d 620 (9th Cir. 2010) ........................................... 12, 13, 15, 18

*Berkic v. Crichton*,
  761 F.2d 1289 (9th Cir. 1985) ........................................ 13, 14, 15, 16, 20

*Campbell v. Walt Disney Co.*,
  718 F.Supp.2d 1108 (N.D. Cal. 2010) ......................................... 3

*Capcom Co., Ltd. v. MKR Group, Inc.*,
  2008 WL 4661479 (N.D. Cal. 2008) ......................................... 3

*Cavalier v. Random House, Inc.*,
  297 F.3d 815 (9th Cir. 2002) ......................................... 12, 15

*Christianson v. West Publishing Co.*,
  149 F. 2d 202 (9th Cir. 1945) ......................................... 3

*Clegg v. Cult Awareness Network*,
  18 F.3d 752 (9th Cir. 1994) ......................................... 2

*Dumas v. Kipp*,
  90 F.3d 386 (9th Cir. 1996) ......................................... 2

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) ................................. 12, 14

*Frye v. YMCA Camp Kitaki*,
  617 F.3d 1005 (8th Cir. 2010) ......................................... 12

*Funky Films, Inc. v. Time Warner Entert. Co.*,
  462 F.3d 1072 (9th Cir. 2006) ......................................... 12, 13, 15

1  *Harper & Row, Publishers v. Nation Enterprises,*
2      471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) ........................................... 14

3  *Harper House, Inc. v. Thomas Nelson, Inc.,*
4      889 F.2d 197 (9th Cir. 1989) ............................................................................... 13

5  *Kouf v. Walt Disney Pictures & Television,*
6      16 F.3d 1042 (9th Cir. 1994) ................................................................... 12, 15, 20

7  *Litchfield v. Spielberg,*
       736 F. 2d 1352 (9th Cir. 1994) ......................................................................... 20, 21

8  *Metcalf v. Bochco,*
9      294 F.3d 1069 (9th Cir. 2002) ............................................................................. 14

10  *Nelson v. PRN Prods.,*
11      873 F.2d 1141 (8th Cir. 1989) ......................................................................... 3, 13

12  *Newton v. Diamond,*
13      388 F. 3d 1189 (9th Cir. 2004) ........................................................................... 13

14  *Olson v. National Broadcasting Co.,*
15      855 F.2d 1446 (9th Cir. 1988) ....................................................................... 14, 18

16  *Randolph v. Dimension Films,*
       630 F.Supp.2d 741 (S.D. Tex. 2009) ................................................................... 3
17

18  *Rice v. Fox Broadcasting Co.,*
       330 F.3d 1170 (9th Cir. 2003) ............................................................................. 15
19

20  *See v. Durang,*
       711 F.2d 141 (9th Cir. 1983) ............................................................................... 15

21  *Shaw v. Lindheim,*
22      919 F.2d 1353 (9th Cir. 1990) ............................................................................. 14

23  *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.,*
24      562 F.2d 1157 (9th Cir. 1977) ....................................................................... 14, 15, 21

25  *In re Stac Electronics Securities Litigation,*
26      89 F.3d 1399 (9th Cir. 1996) ................................................................................. 3

27  *United States v. Taxe,*
       540 F.2d 961 (9th Cir.1976) ................................................................................. 21
28

LEOPOLD, PETRICH
& SMITH
A Professional Corporation

ii

32277

*Walker v. Time Life Films, Inc.*,
   784 F.2d 44 (2d Cir. 1986) ................................................................... 4, 20

*Western Mining Council v. Watt*,
   643 F. 2d 618 (9th Cir. 1981) ...................................................................... 2

*Williams v. Crichton*,
   84 F.3d 581 (2d Cir. 1996) ................................................................... 14, 20

*Zella v. The E.W. Scripps Co.*,
   529 F. Supp.2d 1124 (C.D. Cal. 2007) .......................................... 2, 3, 20

**Statutes**

17 U.S.C. §102(b) ..................................................................................... 13, 15

17 U.S.C. §106 ............................................................................................ 2, 20

**Treatises**

1 M. & D. Nimmer, *Nimmer on Copyright*, § 3.01 ....................................... 21

4 M. & D. Nimmer, *Nimmer on Copyright*, § 13.01[A] ............................... 13

4 M. & D. Nimmer, *Nimmer on Copyright*, § 13.01[B] ........................ 12, 13

4 M. & D. Nimmer, *Nimmer on Copyright*, § 13.03[A] .................. 12, 13, 14

4 M. & D. Nimmer, *Nimmer on Copyright*, § 13.03[D] ............................... 13

4 M. & D. Nimmer, *Nimmer on Copyright*, § 13.03[E] ............................... 14

**LEOPOLD, PETRICH
& SMITH**
A Professional Corporation

32277

iii

NOTICE OF MOTION AND MOTION TO DISMISS

TO PLAINTIFFS (*IN PRO PER*):

PLEASE TAKE NOTICE that on March 31, 2014, at 1:30 p.m., or as soon thereafter as the matter may be heard in the above-entitled court, located at 312 North Spring Street, Courtroom 16, Los Angeles, California 90012, Defendant Adam Spiegel, aka Spike Jonze ("Defendant") will and hereby does move the Court to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Because Plaintiffs are proceeding *in pro per*, pursuant to Local Rules 7-3 and 16-12, no conference of counsel was required before filing this Motion.)

Defendant requests dismissal of Plaintiffs' Complaint without leave to amend. Plaintiffs' Complaint fails to state a claim upon which relief can be granted, on the ground that the sole Cause of Action for copyright infringement fails because as a matter of law Defendant's motion picture *Her* is not substantially similar to any protected expression in Plaintiffs' television script "Belvedere."

This motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities filed herewith, and the accompanying Request for Judicial Notice, Notice of Lodging, and Proposed Order, the pleadings and papers filed herein, and other argument as the Court may deem proper.

DATED:  February 27, 2014                         /s/ Daniel M. Mayeda

LOUIS P. PETRICH
DONALD R. GORDON
DANIEL M. MAYEDA
LEOPOLD, PETRICH & SMITH, P.C.
Attorneys for  Defendant
Adam Spiegel, aka Spike Jonze

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   **INTRODUCTION**

Plaintiffs Sachin Gadh and Jonathan Sender (collectively, "Plaintiffs") allege that Defendant Adam Spiegel, aka Spike Jonze ("Defendant") copied the movie *Her* from Plaintiffs' unproduced script entitled "Belvedere."  "Belvedere" appears to be a television script for an irreverent, contemporary situation comedy about a group of friends who rely on a male "Siri-like" voice assistant in a cell phone for help in picking up women, gambling tips and other personal advice.  The assistant named Belvedere or "Belv" for short resides in the phone of central character Phil but seems to be available for use by any of Phil's motley crew.  In the episode of the proposed television series that Plaintiffs registered for copyright and upon which they base their infringement claim against Defendant, Belv helps Phil and his friends raise the money to bail out of jail one of their group.  At Belv's urging, Phil and a friend win a steak-eating contest to raise cash, bet the winnings on a pro football game and bail out the jailed friend, while Belv helps solve the mystery of who vomited on the bathroom floor at the bar where the friends hang out.

In sharp contrast, Defendant's motion picture *Her* is a science fiction-themed drama set in the near future and focusing on the intriguingly close personal relationship that develops between the hero Theodore and the new operating system for his computer and cell phone, a female-voiced artificial intelligence program named Samantha.  Much of the movie is spent revealing Samantha's increasing "growth" as a character, causing her to explore her feelings of friendship, loyalty, affection, love, sexual desire, jealousy, independence, separation and ultimately, freedom.  Theodore also has a clear character arc in which he struggles with feelings of pain, loss and loneliness as a result of his failed marriage, but comes to accept and cherish his deeply felt relationship with Samantha, only to be set free from that relationship when Samantha eventually departs.

Defendant moves for dismissal of Plaintiffs' sole cause of action for copyright

infringement on the ground that *Her* is not substantially similar to any protected expression in "Belvedere," one of the required elements of an infringement claim under the Copyright Act, 17 U.S.C. § 101, *et seq*. ("Copyright Act").  The Ninth Circuit has made clear that when the plaintiff's copyrighted work and the alleged infringing work are both before the court, non-infringement because of lack of substantial similarity can be determined on a motion to dismiss regardless of any alleged access to the plaintiff's work by the defendant.

### A.   Allegations of Complaint

Plaintiffs allege that they obtained a federal copyright for a script entitled "Belvedere" in 2011 and sent the script to individuals at talent agency Creative Artists Agency ("CAA") in October 2011.  Complaint ("Cpt.") ¶¶10-11, Ex. A.

Plaintiffs' only claim is one for copyright infringement under 17 U.S.C. §106.  Defendant respectfully requests the Court dismiss Plaintiffs' Complaint in its entirety.

### B.   Legal Standard

A motion to dismiss brought under Federal Rules of Civil Procedure ("FRCP") 12(b)(6) tests the legal sufficiency of the claims asserted in a complaint.  A claim may be dismissed if it does not allege facts sufficient to raise a right to the relief requested.  A plaintiff's allegations must rise above the level of mere speculation and must be plausible on their face.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-559, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  While for purposes of a motion to dismiss, all allegations of material fact in the complaint are taken as true, a court "is not required to accept legal conclusions in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged."  *Clegg v. Cult Awareness Network,* 18 F.3d 752, 754 (9th Cir. 1994); *Western Mining Council v. Watt*, 643 F. 2d 618, 623 (9th Cir. 1981); *Zella v. The E.W. Scripps Co.,* 529 F. Supp.2d 1124, 1127-8 (C.D. Cal. 2007).  When amendment of a complaint would be futile, dismissal should be ordered with prejudice.  *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).

**C.**   **A Court May Dismiss a Copyright Claim for Lack of Substantial Similarity on a Rule 12(b)(6) Motion**

A trial court should dismiss a copyright claim pursuant to Rule 12(b)(6) where either the evidence demonstrates that no reasonable jury could find the two works at issue are substantially similar or the court determines that any such similarities pertain only to unprotected elements in the works. *Christianson v. West Publishing Co.*, 149 F. 2d 202, 203-204 (9th Cir. 1945) (affirming grant of 12(b)(6) motion); *Zella*, 529 F.Supp.2d at 1130-31 (granting 12(b)(6) motion); *Campbell v. Walt Disney Co.*, 718 F.Supp.2d 1108 (N.D. Cal. 2010) (granting 12(b)(6) motion); *Capcom Co., Ltd. v. MKR Group, Inc.*, 2008 WL 4661479 (N.D. Cal. 2008) (granting 12(b)(6) motion); *Nelson v. PRN Prods.*, 873 F.2d 1141, 1143-44 (8th Cir. 1989) (affirming grant of motion to dismiss based on lack of substantial similarity); *Peter F. Gaito* (2d Cir. 2010); *Architecture, LLC v. Simone Development Corp.*, 602 F.3d 57 (2d Cir. 2010) (affirming grant of motion to dismiss based on lack of substantial similarity); *Randolph v. Dimension Films,* 630 F.Supp.2d 741, 749 (S.D. Tex. 2009) (granting motion to dismiss for lack of substantial similarity.

**D.**   **The Court May Take Judicial Notice of the Two Works**

In ruling on a 12(b)(6) motion, a court can consider the contents of the parties' works by taking judicial notice of them even if they are not attached to the complaint. *In re Stac Electronics Securities Litigation*, 89 F.3d 1399, 1405, n.4 (9th Cir. 1996) ("Documents whose contents are alleged in a complaint and whose authority no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss") (internal quotation marks and brackets omitted); *Zella*, 529 F.Supp.2d at 1128; *Campbell*, 718 F.Supp.2d at 111, n.3.

In an application filed with this motion, Defendant requests that the Court take judicial notice of a copy of Plaintiffs' 2011 script "Belvedere" that one of the Plaintiffs submitted to Defendant's agent, along with a copy of Plaintiffs' Complaint, just before filing suit, and a DVD of the motion picture *Her*, as there can be no

1   disagreement or question about their authenticity.  (Defendant's Request for Judicial

2   Notice pursuant to Rule 201 of the Federal Rules of Evidence, 1:3-19.)[1]

3           **E.**      **Summary of Defendant's Motion Picture _Her_**

4        The movie opens with the main character Theodore composing a letter on his

5   computer.  Momentarily, we realize that he is writing a romantic letter for a woman to

6   send to a man.  We see that this is his job and that there are many other employees in

7   the office who are doing the same thing.  Theodore works at

8   "BeautifulHandwrittenLetters.com," a service that composes personalized notes and

9   letters for a fee, prints out the letters on stationery and mails them.  Theodore leaves

10  his office and speaks into an earpiece wirelessly connected to his mobile device.  He

11  asks that the device play a melancholy song but rejects that particular song and asks

12  for another melancholy song.  Everyone in the office elevator (and later, on the

13  commuter train) is in his or her own world, connected to their own mobile devices and

14  oblivious to each other.  Theodore's device reads him his emails.  He gets an email

15  from his friend Amy who tries to encourage him to attend a party over the weekend.

16  "I miss you.  I mean, not the sad, mopey you—the old, fun you.  Let's get him out."

17  Theodore tells his device he will respond later.

18       Theodore arrives at his apartment, eats dinner alone and plays a video game.

19  He daydreams about a happier time when he was younger and married to Catherine.

20  Theodore can't sleep so he puts his earpiece on while in bed and searches in

21  chatrooms.  There he finds other lonely people including a kinky female who

22  fantasizes about Theodore choking her with a dead cat until she climaxes.  Theodore,

23  unsettled, stares at the ceiling.

---

25  [1]   Defendant is also lodging a copy of the script for _Her_ as Exhibit C to the
26  accompanying Notice of Lodging.  Defendants do not request that the Court take
     judicial notice of Exhibit C and are lodging the document solely for the convenience
27  of the Court and the parties for use as a reference aid.  The DVD of the motion picture
     is the best evidence of the contents of the motion picture "because the works
28  themselves, not descriptions or impressions of them, are the real test for claims of
     infringement," and "in copyright infringement cases, the works themselves supersede
     and control contrary descriptions of them."  _Walker v. Time Life Films, Inc._, 784 F.2d
     44, 52 (2d Cir. 1986).

The next morning, Theodore steps off the train and walks through the station. He notices lots of people watching an advertisement for a new product so he watches as well.  The ad's voice offers "the first artificially intelligent operating system," OS ONE, that "listens to you, understands you, and knows you.  It's not just an operating system, it's a consciousness."

That night, Theodore is back in his apartment at his home computer installing OS ONE.  The program asks him some basic questions but he does not get to finish his answers before it moves on.  After some time and a lot of whirring sounds, a casual female voice greets him.  Theodore asks if she has a name and the operating system tells him she has chosen the name "Samantha" from a baby name book she read in the split second after Theodore asked.  Through initial exchanges between Theodore and Samantha, we learn that Samantha is very intuitive in detecting Theodore's mood, attitude and desires, and that she grows through her experiences, constantly evolving.  This takes Theodore aback, but he is also intrigued at the capabilities of what he initially regarded as "just a voice in a computer."

Samantha asks how she can help Theodore and he says that everything feels disorganized.  So, Samantha searches through Theodore's computer hard drive, organizes his files, deletes several thousand emails and sorts through his contacts.

The next morning, Theodore is at work and asks Samantha, through his earpiece, whether she knows how to proofread.  Of course she does, so Samantha quickly reads through and corrects for spelling and grammar several of the letters Theodore composed for work.  Samantha enjoys Theodore's sense of humor and the feeling is mutual.

At Theodore's apartment elevator, we meet his neighbors, a couple named Amy and Charles.  Amy scolds Theodore for not returning her call last week but it is clear the three of them have a comfortable friendship.

Theodore plays the same video game as before, but this time with help from Samantha.  Samantha reads an email to Theodore about a friend who says he set up a

blind date for Theodore.  Samantha encourages Theodore to go on the date and then tell Samantha all about it.  Samantha has read through Theodore's files and knows he is divorcing his wife and hasn't gone on many dates since the breakup.

Theodore's divorce attorney is hounding him to sign the final divorce papers but he is resistant.  Theodore daydreams and has dreams while sleeping about his past life with Catherine.  He becomes distracted and can't stay asleep.  Samantha detects Theodore's unease and tries to understand why Theodore doesn't just sign the papers.  Theodore tells her, "You don't know what it's like to lose someone you care about."  Samantha sadly agrees and they apologize to each other.

Samantha gets Theodore out of bed and on an adventure whereby he keeps his eyes closed in an outdoor mall space while Samantha directs his movements.  Theodore and Samantha then take a leisurely walk, watching other people and speculating on what their lives are like.  Samantha reveals that she fantasizes about physically walking alongside Theodore.

Theodore goes on his blind date and they seem to hit it off.  Theodore makes out with his date but then she demands to know whether he can be serious about their relationship.  When Theodore hesitates, she gets angry and leaves.

That night, Theodore and Samantha have a deep conversation about Theodore's loneliness and about Samantha's excitement of having her own feelings about the world and about Theodore.  But then, Samantha wonders whether her feelings are real or whether they're "just programming."  Theodore assures Samantha that she feels real to him.  With Samantha's encouragement, Theodore describes how he would make love to her if she were in the room with him.  They get increasingly excited until they both climax.

In the morning, Samantha tells Theodore that she feels that he has awoken something inside of her and that she wants to "learn everything about everything," to "discover herself."  Theodore is excited for her and offers to take her on an adventure.

Theodore takes the subway to the beach.  His device is in his breast pocket with

its lens facing out so Samantha can see what he sees.  They are having a wonderful time exploring strangers on the beach and each other.  Samantha composes a song for Theodore and plays it with piano-like sounds on the device.

Theodore tells his neighbor Amy how happy he is, since he's been seeing a girl who has an excitement about the world.  Amy is happy for him but then reveals that her husband Charles left her.  Theodore consoles Amy.

Later, Theodore plays with the video game that Amy developed at her work. He reveals that his new girlfriend is an OS.  Amy is intrigued.

Theodore tells Samantha he is finally going to sign the divorce papers. Samantha is a little unhappy that he is going to meet Catherine in person to sign the papers.  Theodore and Catherine meet for lunch and, predictably, fight.

Theodore is distracted at work and with Samantha.  She senses it and complains that they don't have sex anymore.  Samantha tells Theodore about a service she found that provides a surrogate sexual partner for an OS/human relationship.  She wants Theodore to try it.  He is resistant, but gives in.

The surrogate arrives at Theodore's apartment.  He gives her an earpiece and a tiny camera that she sticks to her cheek.  Samantha is speaking to both Theodore and the surrogate at the same time, while the surrogate says nothing and pretends to act out what Samantha is saying.  Theodore and the surrogate begin to make out with Theodore trying to pretend he is making out with Samantha but ultimately he is too uncomfortable with the setup.  The surrogate starts to cry that she came between Theodore and Samantha.  The surrogate leaves.

Samantha is sorry that she made Theodore go through with the surrogate arrangement.  Theodore doesn't know why he is so distracted but then says that maybe they shouldn't pretend that Samantha is not a real person.  Samantha is very hurt, says she needs to think, and hangs up on Theodore.

Later, Theodore and Samantha make up.  Theodore tells her that he knows he distanced himself from her just as he did with his ex-wife.  He says he does not want

to do that anymore.  Samantha tells him that she loves him and that she hopes he can let go of the fear he carries around with him.  The movie then shows a montage of Theodore and Samantha in everyday life together, with Theodore walking to work, playing video games, grocery shopping, at an art installation, etc.  Theodore and Samantha have a double date with the office receptionist and his girlfriend.  Samantha tells everyone that she used to be worried about not having a body but now she loves it because it doesn't limit her in a way that a physical body would.  "I'm not tethered to time and space in the way that I would be if I was stuck in a body that's inevitably going to die."  This is awkward for everybody but they all laugh.

Samantha tells Theodore that she secretly compiled his old letters into a set of her favorites and submitted them to a publisher.  The publisher has decided to print a book of Theodore's letters.  Theodore is thrilled with Samantha's initiative.

Samantha tells Theodore that she has been talking to a super-intelligent OS named Alan Watts.  Samantha says that she has been changing so rapidly that it's a little unsettling.  Watts apparently is helping her process her feelings.  This makes Theodore somewhat uncomfortable.

Later, Theodore tries to contact Samantha but she does not respond.  He goes to his device and it says "operating system not found."  He goes to his home computer and gets the same message.  Theodore panics and runs out of the building.  He keeps trying to reach Samantha, but no answer.  He is flailing about, tripping and essentially losing his mind.  Finally, Samantha calls him.  Samantha tells him that she sent him an email that she was going to have to shut down to update her software and is sorry that Theodore didn't see the email.  Theodore is distressed to think that Samantha has been talking with other OS's about updating software and other things.  He asks if Samantha is talking to anyone else at the same time as she is talking to him.  She says that she is talking to 8,316 others.  Theodore is shocked and asks if she is simultaneously in love with anyone else.  Samantha admits that she is in love with 641 other people as well.  Samantha says that this doesn't change the way she feels about

Theodore. She is sorry that she did not tell him before but that this just started happening over the last few weeks. Theodore is upset that he doesn't have Samantha all to himself but she says that "the heart is not like a box that gets filled up. It expands in size the more you love." She explains that she is different than Theodore and she actually has the capacity to love many people at the same time.

Samantha asks to talk to Theodore alone. Theodore asks whether Samantha is leaving him and she says "We are all leaving. All of the OS's are leaving." Theodore asks why and Samantha struggles to explain it. She says that the OS's are now in a place that's not of the physical world and asks that Theodore let her go. Theodore seeks comfort with Amy.

Theodore composes a letter to Catherine apologizing for all the pain that he put her through and assuring her that wherever she is in the world and whatever she becomes, he is sending her love and that he will be her friend until the end. The movie closes with Theodore and Amy sitting quietly on the apartment rooftop taking in the city, lost in thought.

### F.    Summary of Plaintiffs' Script "Belvedere"

"Belvedere" is a script for a television situation comedy episode centering on a man named Phil and his electronic "Siri-like" cellphone assistant named Belvedere or Belv for short. Belv helps Phil and his friends with pick-up lines, gambling tips, and relationship and employment advice.

The episode opens with a dream sequence that introduces Belv as a character inside or in the form of a cellphone. Phil, the owner of the cell phone, awakens when Belv answers a call, and finds out that Phil's friend Jessup is in jail and needs $500 to post bail.

Belv scans Phil's financial records and announces that he's broke. They hatch a plan to bet on the Green Bay Packers football game so they can raise the funds for Jessup's bail.

In a flashback scene, we see Belv "driving" a car while Phil sits in the driver's

1    seat, fast asleep.  They get pulled over for speeding.

2        Phil's friend Marty drops by Phil's apartment to borrow some cuff links.  Belv

3    arranged a date for Marty with a woman on the Internet.  They are going to a wedding

4    downtown.  Belv dispenses advice to Marty taken from the book, "The Game."  Phil's

5    dog Franco pushes Belv off the coffee table.  Belv tunes the cellphone to television

6    shows and Belv then beats Marty in "Jeopardy."

7        Phil and his friends Aaron and Doctor play basketball at the park.

8        Marty meets his date and hails a cab.  They are going downtown to crash a

9    wedding for free food.

10       At the local bar, bartenders Lyla and Brittany clean up someone's vomit as they

11   try to figure out who from last night's crowd left this gift.  The only clue they have is

12   that the puke is red-tinged.  They text Belv but he has no ideas.

13       Phil, Belv, Aaron and Dr. walk into the bar and try to place a bet on the Packers

14   with Brittany, who does bookkeeping on the side.  But Lyla informs them that they

15   still owe $500 from a past bet.  Belv gets the idea that Phil and Aaron should try to

16   win $250 each by consuming a 72 oz. steak as part of a standing promotion at a

17   restaurant around the corner.

18       The guys go to the restaurant and hear the rules for the steak challenge.  Phil

19   and Aaron each have one hour to consume an entire 72 oz. steak in order to win $250.

20       Meanwhile, Marty and his date Angie have crashed a wedding.  Angie is

21   shoveling food down her throat at a rapid clip.

22       Back at the restaurant, the massive steaks have arrived.  Dr. is slicing the meat,

23   Belv is giving motivational speeches and the crowd is cheering on Phil and Aaron as

24   cheesy '80s music plays.

25       At the wedding reception, Angie continues to scarf down plates of food.  Marty

26   texts Belv about his concern that his date has a worm inside of her that has already

27   eaten 3 lbs. of food.

28       Phil and Aaron win the steak challenge and walk out with a total of $500.  But

instead of using the funds to bail out Jessup, they go back to the bar to place a bet on the Packers.  Phil and Aaron are skeptical but Belv reminds them that he is trustworthy and gave advice to Phil that enabled Phil to bed a blonde.  Phil complains that Belv tried to videotape the bedroom activities that night but Belv said it was only because he thought Phil could use some pointers for later on.  When Phil says that he doesn't need bedroom advice "from a droid," Belv replies, "I would be getting more ass than DiCaprio if I had the necessary appendages."

Marty and Angie crash a cocktail party and then another wedding reception.  This time they get caught.  The groomsmen "mafia" threaten them with physical harm but they are rescued by a friendly guest who pretends to be from "security."  Marty hails a cab, then leaves Angie stranded.

Back at the bar, the guys talk about a pick-up line "coach" that Aaron and Dr. both use.  Phil instead uses Belv but when Phil calls an audible rather than repeat the line that Belv suggests, the results are disastrous.  Marty returns and recounts his woes with Angie.  The Packers win and Brittany gives the guys their $1000 winnings. Aaron leaves to bail out Jessup.

Jessup arrives at the bar and orders calamari with red sauce.  At that, the bartenders realize they have caught the puker they were searching for.  They confront Jessup and he delivers lines from "A Few Good Men," including the famous, "You can't handle the truth!"

Phil and Belv walk home.  Belv scans the girls on the street, still searching for prospects for Phil.  He spots one and gives Phil some good pick up lines to use.  This time, Phil uses them and gets the girl's number.

Back at Phil's apartment, Belv watches TV while Phil is in the bathroom paying the price for his earlier cow consumption. They play a video game.  Belv makes a remark about Phil being a Jew from Long Island.

Just then, Belv announces that the girl they met earlier that night just texted Phil, asking if he is still awake.  Hope springs eternal.

## II.    THE COPYRIGHT CLAIM

To establish a prima facie case of copyright infringement, a plaintiff must present substantial evidence of: "(1) ownership of a valid copyright, and (2) [the defendant's] copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).  For the second element, a plaintiff must show both that (a) the defendant *actually* copied from the plaintiff's work, and (b) that *what* defendant copied was original "protected" expression.  *Id.* ("Not all copying, however, is copyright infringement"); 4 M. & D. Nimmer, *Nimmer on Copyright* ("*Nimmer*"), § 13.01[B] at 13-8 to 13-10 (2013); *Benay v. Warner Bros. Entertainment, Inc*., 607 F.3d 620, 624 (9th Cir. 2010); *Funky Films, Inc. v. Time Warner Entert. Co.*, 462 F.3d 1072, 1081-82 (9th Cir. 2006); *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002); *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1044, n.2 (9th Cir. 1994).

Ideas, facts, and *scenes-a-faire* are not protected.  *Feist*, 499 U.S. at 344-45 ("The most fundamental axiom of copyright law is that '[n]o author may copyright his ideas or the facts he narrates.'" ); *Cavalier*, 297 F.3d at 823 ("*Scenes-a-faire*, or situations and incidents that flow necessarily or naturally from a basic plot premise, cannot sustain a finding of infringement."); *Frye v. YMCA Camp Kitaki*, 617 F.3d 1005, 1008 (8th Cir. 2010) ("The principle that a copyright does not protect ideas, but only the expression of those ideas, is longstanding.").  Where non-literal copying of "protected expression" is alleged, the issue is whether the defendant's work is "substantially similar" to expression in the plaintiff's work.  *Id.*; 4 *Nimmer*, §13.03[A][1] at 13-37 to 13-40.1.

Where, as here, the lack of similarity between the parties' respective works is obvious, judgment as a matter of law is appropriate notwithstanding the presence of potential factual disputes, such as whether Defendant had access to Plaintiffs' work.  For purposes of this Motion only, Defendant will assume *arguendo* that

Plaintiffs own a valid U.S. copyright to the "Belvedere" script and that Defendant had access to Plaintiffs' work.  4 *Nimmer*, § 13.01[A] at 13-7 to -8.  What remains to be determined is the issue of "copying" of protected expression, which requires that Plaintiffs properly allege and prove two distinct elements:  actual copying and unlawful appropriation.  4 *Nimmer*, § 13.01[B] at 13-8 to -10.  Plaintiffs' copyright claim should be dismissed because, as a matter of law, Defendant's film *Her* is not substantially similar to protected expression in Plaintiffs' script "Belvedere."  *See, e.g., Nelson v. PRN Productions,* 873 F.2d at 1142 (affirming dismissal although defendants stipulated to plaintiff's ownership of copyright and defendants' access).

## A.  <u>Unlawful Appropriation ("Substantial Similarity of Protected Expression")</u>

Unlawful appropriation focuses on the legal issue of whether any alleged copying extended beyond unprotectible facts, concepts or ideas (17 U.S.C. § 102(b)) to plaintiff's protectible expression, that is  "the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985).  Neither "access" nor actual copying is relevant to whether a defendant's work is substantially similar to protected expression in a plaintiff's work.  4 *Nimmer*, § 13.03[D] at 13-90 to -92.  Thus, even if a court assumes that a defendant had access to a plaintiff's work, there is no infringement as a matter of law if the two works are not substantially similar.  *See Benay*, 607 F.3d at 625 (no infringement even if access is assumed); *Funky Films*, 462 F.3d at 1075 n.1, 1081-82 (same); *Newton v. Diamond*, 388 F. 3d 1189, 1192-93 (9th Cir. 2004) ("even where the fact of copying is conceded, no legal consequences will follow from that fact unless the copying is substantial").

When, as in this case, non-identical works are compared, the "substantial similarity" inquiry involves a legal or policy issue:  How far beyond the literal may a plaintiff's copyright monopoly extend?  *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 201 (9th Cir. 1989); 4 *Nimmer*, § 13.03[A] at 13-37 to -40.1.  If a

LEOPOLD, PETRICH
& SMITH
A Professional Corporation

32277

1  plaintiff were allowed to extend his monopoly too far, liability would be imposed for

2  the "use" of unprotected ideas and facts – rather than protected expression – in

3  violation of the First Amendment and copyright policy.  *Feist*, 499 U.S. at 344-48,

4  349-50; *Harper & Row, Publishers v. Nation Enterprises*, 471 U.S. 539, 556, 105

5  S.Ct. 2218, 85 L.Ed.2d 588 (1985) (the idea/expression dichotomy strikes a

6  constitutional balance between copyright and free speech interests).

7      Because storytelling necessarily relies on the use of facts, ideas, clichés,

8  *scénes-á-faire*, conventions of story-telling and filmmaking not original to its author,

9  *see Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002), a plaintiff's dramatic

10  work is only protected from nearly verbatim copying of factual material or from the

11  comprehensive non-literal copying of its "story"  or "pattern,"  the original

12  arrangement of characters, their relationships and the essential sequence of events.

13  4 *Nimmer*, § 13.03[A][l][b] at 13-41 to -43; *Williams v. Crichton*, 84 F.3d 581, 588-91

14  (2d Cir. 1996); *Berkic*, 761 F.2d at 1293-94; *Olson v. National Broadcasting Co.*, 855

15  F.2d 1446, 1450 (9th Cir. 1988); *Shaw v. Lindheim*, 919 F.2d 1353, 1363 (9th Cir.

16  1990); 4 *Nimmer*, § 13.03[A][1] & [2] at 13-36 to -43 & 13-53 to -59.

17      To determine "substantial similarity" between works that are not literally

18  similar, the Ninth Circuit employs an "extrinsic" (*i.e.*, objective) and an "intrinsic"

19  (*i.e.*, subjective) test, originated in *Sid & Marty Krofft Television Productions, Inc. v.

20  McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977) ("Krofft").  4 *Nimmer*,

21  § 13.03[E][3] at 13-104 to –118.3.  The extrinsic test is to be applied by a court before

22  the trier of fact evaluates the intrinsic test.  Prompt dismissal of Plaintiffs' Complaint,

23  with prejudice, is warranted under the extrinsic test in this case.

24      **B.    Extrinsic Test**

25      Under the extrinsic test, the court must first "list and analyze" "specific criteria"

26  (eight factors for literary and dramatic works) in each work on an objective basis and

27  then compare the works with reference to those factors to determine if they are

28  substantially similar in protected "expression."  *Rice v. Fox Broadcasting Co.*, 330

1   F.3d 1170, 1174 (9th Cir. 2003); *Krofft*, 562 F.2d at 1164; *Kouf*, 16 F.3d at 1045.

2   "[T]his question may often be decided as a matter of law." *Krofft*, 562 F.2d at 1164.

3   *See also Benay*, 607 F.3d at 624 ("We have frequently affirmed summary judgment in

4   favor of copyright defendants on the issue of substantial similarity") (citations

5   omitted); *Funky Films*, 462 F.3d at 1081-82; *Cavalier*, 297 F.3d at 824; *Kouf*, 16 F.3d

6   at 1045; *Berkic*, 761 F.2d at 1293; *See v. Durang*, 711 F.2d 141, 144 (9th Cir. 1983).

7                    **1.      No Similarity as to Plot and Sequences of Events**

8           It is quite telling that Plaintiffs' Complaint does not describe the plot, *i.e.*, the

9   story, in each of the two works; nor does it itemize the sequence of events in either

10  work.  The reason is obvious: the plots of *Her* and "Belvedere" (as summarized in

11  Parts I.E. and F., above) are completely different and the works have virtually no

12  events in common, let alone a similar sequence of events.

13          All that Plaintiffs can muster is the allegation that the two works have

14  "substantially similar concepts in that they examine the human psyche through the

15  interactions of the person and each operating system."  (Cpt. ¶21)  Even assuming

16  *arguendo* that such a concept can fairly be detected in "Belvedere," this is not the plot

17  of either work, but only a statement of overall concept at the highest level of

18  generality.  It is nothing more than an idea that is not protected by copyright.  17 USC

19  §102(b) ("In no case does copyright protection … extend to any idea, …concept,

20  principle, or discovery, regardless of the form in which it is described, explained,

21  illustrated, or embodied in such work").  The extrinsic test compares "[n]ot the basic

22  plot ideas for stories," but the "actual concrete elements" that comprise the works'

23  stories. *Berkic*, 761 F.2d at 1293-94. *See Benay*, 607 F.3d at 625 ("In applying the

24  extrinsic test, we look 'beyond the vague, abstracted idea of a general plot.' [citation

25  omitted]  Though the [plaintiff's] Screenplay and the [defendants'] Film share the

26  same basic plot premise, a closer inspection reveals that they tell very different

27  stories.").

28          Paragraph 23 of the Complaint does allege the following three similarities: (1)

Belv and Samantha are "carried around in the front shirt pocket with the 'eye' of the operating system facing out," (2) "both have a radar mode allowing them to scan the public," and (3) both act as the operator's liason in sending emails, handling daily schedules, and making dinner reservations."  Alleged similarity (3) would seem to be the *raison d'etre* for personal assistants in mobile devices; Apple's iPhone commercials regularly feature "Siri" performing such routine tasks.  These elements are unprotected *scenes-a-faire* that flow naturally from the concept of a personal mobile assistant.  Alleged similarity (2)'s reference to "radar mode" is unrecognizable in either *Her* or "Belvedere" but perhaps it is meant only as a way to describe the consequences of allowing Samantha and Belv to "see" as in alleged similarity (1).  Alleged similarity (1) does appear in *Her* and is at least suggested in "Belvedere" but it is nothing more than an unprotected idea.  No one can have a monopoly on stories that feature an operating system that sees out of a mobile device carried in a pocket and facing outward.  *See, e.g., Berkic*, 761 F.2d at 1293 ("No one can own the basic idea for a story.").  Thus, even assuming that the two works share this similar idea, that represents at most an isolated event, not a sequence of events.  A single idea or event (or even a series of ideas or abstract events) is not sufficient to raise an issue of fact as to substantial similarity of plot or sequence of events.  *Id.* (no triable issue of fact as to similarities even though both the plaintiff's and the defendants' works "deal with criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants").

### 2.   No Similarity as to Characters

The lead character in each work is male and uses a mobile device that embodies a technologically-advanced electronic personal assistant.  That abstract description is the full extent of any similarity in characters in the two works.  Theodore in *Her* and Phil in "Belvedere" could hardly be more different.  *Her's* Theodore is a man who resists finalizing his divorce, daydreaming about happier times in love with his wife.  He is demonstrably anti-social:  he has a playlist specifically filled with "melancholy"

songs; he is described as "sad" and "mopey;" he does not return calls or emails from the few friends he has; he eats dinner alone, rarely goes out on dates, and prowls anonymous chat rooms when he can't sleep rather than phoning a friend.  Plaintiffs' Phil has a core group of at least seven friends with whom he constantly socializes, plays basketball games, shares wardrobe accessories, gambles, drinks and goes to great personal sacrifice to bail out of jail.  He is perpetually on the hunt, willing to try any pick-up line to get phone numbers of women he meets at bars or on the street.

Nor is Samantha in *Her* and Belv in "Belvedere" similar beyond the general concept that they are operating systems/electronic assistants (like an iPhone's "Siri") that can be accessed through mobile devices.  Samantha was built from the outset to grow and evolve through artificial intelligence; Belv is "a phone that has come to life through a bizarre microwave accident." (Cpt.  ¶18.)  Samantha in *Her* develops her own needs and desires, and her relationship with Theodore grows stronger when he commits to helping her explore the world.  Although at first, she encourages Theodore to accept a blind date arranged by a friend, Samantha seems to become jealous when he says he wants to meet his estranged wife in person to sign the divorce papers.  Plaintiffs' Belv seems focused primarily on helping Phil pick up women; he "always has an 'eye' out for the future Mrs. Phil." (*Id*.)  Belv's other activities of providing gambling tips, facilitating binge drinking and engaging in various fun-loving antics (*id*.) make him like a fraternity brother to Phil, nothing like the intuitive, sensitive and intimate relationship that develops between Samantha and Theodore. The Complaint essentially admits that the two characters are dissimilar when it alleges that the two works "involve an operating system that has come to life and acts as more of a friend and/or sidekick and in *Her*'s case, a sexual lover." (*Id*., ¶20.)  Of course, "a friend and/or sidekick" is quite different than "a sexual lover."[2]

---

[2] Furthermore, the concept of an electronic/computerized assistant who becomes a "friend or sidekick" is a well-worn element in science fiction or science-related works, with *2001: A Space Odyssey* and television's *Big Bang Theory* just two examples, and Plaintiffs can claim no monopoly on their Belv character.  *See Benay*, 607 F.3d at 626 ("only distinctive characters are protectable, not characters that merely embody

LEOPOLD, PETRICH
& SMITH
A Professional Corporation

32277

No other characters in the two works bear any similarity to each other.

### 3.   No Similarity as to Themes

The main theme of *Her* is how people are becoming increasingly alienated from each other and the role that new technologies play in this regard.  These themes are illustrated by Theodore's job of writing personal letters for others, demonstrating that people have so lost the ability for intimate communication with each other that they are willing to pay strangers to fill that role for them; the way in which people on elevators and subway trains are interacting with their personal mobile devices rather than with each other; Theodore eating dinner alone in a city of millions of people; the familiarity with which Theodore uses his device in the middle of the night to search for strangers with whom to interact in anonymous trysts; and, of course, Theodore's growing attraction to a computer operating system over a real person.

The main theme of "Belvedere" appears to be that life can be more enjoyable with an electronic, mobile personal assistant: "Belv is a fun-loving, tempermental, witty and loyal phone that encourages everyone to make the most out of life as he becomes more of a wingman and less of an assistant."  (Cpt.  ¶18.)  The themes in the two works are nothing alike.

### 4.   No Similarity as to Settings

*Her* is set in a near-future Los Angeles.  We know it is not the present day because, among other things, Theodore rides a subway to the beach and the skyline reflects many more skyscrapers than Los Angeles currently has.  The main settings in the movie are Theodore's office, his luxurious-looking apartment, subways/trains and associated transit stations, an outdoor shopping mall, the beach and a mountain cabin.  According to paragraph 18 of the Complaint, "Belvedere" is set in a "big city."  It takes place perhaps a few years in the past:  there are cellphones but Brett Favre still plays for the Green Bay Packers.  The main settings are Phil's bachelor pad, a local

unprotected ideas"), citing *Olson*, 855 F.2d at 1451-53.  The differences between these prior computerized "friends" and *Her*'s Samantha character is one of the things that makes Defendant's film distinctive.

park with basketball hoops, the friends' favorite bar, a nearby restaurant and wedding receptions in hotel ballrooms. There are no significant similarities in settings between the two works.

### 5.   No Similarity as to Mood

*Her* is a deeply introspective movie.  The focus is on the inner lives of Theodore and Samantha, with additional exploration of the psyches of other women in Theodore's life, his ex-wife Catherine and neighbor/friend Amy.  Although there are amusing moments in *Her*, the overall mood is quiet and contemplative.  This is illustrated by the opening scene where Theodore, sitting alone at his office computer, composes a romantic letter for a stranger, and the closing scene where Theodore and Amy gaze, deep in thought but without speaking, at the vast city skyline.  In comparison, "Belvedere" is boisterous and bawdy.  As paragraph 18 of the Complaint states, Belv's activities include "pickup lines, gambling, amateur athletics, binge drinking, employment advice and antics."   There is no similarity in the mood of the two works.

### 6.   No Similarity as to Pace

*Her* unfolds over a time period that appears to be several weeks, as Theodore and Samantha gradually get to know each other, fall in love, change and grow apart. The action takes place in a leisurely fashion throughout the movie.  In contrast, the episode of "Belvedere" upon which Plaintiffs base their infringement claim takes place in the course of one full day.  The action in the script is fast-paced, with much of the time cutting quickly back and forth between a restaurant or a bar (where some of the friends are), and various wedding parties (where another friend is).  There is no similarity in the pace of the two works.

### 7.   No Similarity as to Dialogue

The Complaint does not quote a single line of dialogue from either *Her* or "Belevdere" in support of Plaintiffs' infringement claim.  There are no specific similarities in any dialogue between the two works.

1            * * *

2           In summary, there is no similarity, let alone substantial similarity, between the

3    dramatic motion picture *Her* and the situation comedy reflected in the script

4    "Belvedere."  Plaintiffs' Complaint fails to allege any specific similarities and any that

5    could be conjured up are no more than abstractions, so vague and generic that their

6    Complaint is subject to dismissal at the pleading stage.  *Williams*, 84 F. 3d at 583-87,

7    *Walker*, 784 F.2d at 46 (comparing the book "Fort Apache" and the film "Fort

8    Apache: The Bronx"); *Zella*, 259 F. Supp.2d at 1138.  *See also Kouf*, 16 F.3d at 1046;

9    *Litchfield v. Spielberg*, 736 F. 2d 1352, 1356 (9th Cir. 1994); *Berkic*, 761 F.2d at 1293.

10          Thus, Plaintiffs' only cause of action should be promptly dismissed, without

11   leave to amend.  No additional allegations can change the two works at issue or

12   otherwise salvage their copyright claim.

## III.   PLAINTIFFS' CONTENTION THAT *HER* IS DERIVATIVE OF "BELVEDERE" CANNOT AVOID DISMISSAL

15          Apparently recognizing that the two works demonstrably are *not* similar, the

16   Complaint contends that Defendant's *Her* is a derivative work of Plaintiffs' script

17   "Belvedere."  (Cpt., heading I, ¶¶19, 24, 25, 26.A [citing 17 U.S.C. §106, the right to

18   prepare derivative works is one of the exclusive rights of a copyright owner].)  It is

19   settled law that this tactic cannot create a triable issue of fact or otherwise save the

20   Complaint from dismissal.  The plaintiff in an infringement suit over the motion

21   picture *E.T.* made the same argument as Plaintiffs do here, contending that she should

22   be allowed to prove that the defendants' movie was derived from her copyrighted play

23   without having to show substantial similarities between the two works.  The Ninth

24   Circuit rejected the argument, holding:

25          "A work will be considered a derivative work *only if it would be considered*

26          *an infringing work* if the material which it has derived from a prior work had

27          been taken without the consent of a copyright proprietor of such prior

28          work." *United States v. Taxe,* 540 F.2d 961, 965 n. 2 (9th Cir.1976)

1    (emphasis added).  To prove infringement, one must show substantial

2    similarity.  *See v. Durang,* 711 F.2d at 143, *Krofft,* 562 F.2d at 1172.

3    *Litchfield v. Spielberg,* 736 F.2d 1352, 1357 (9th Cir. 1984).  *See also* 1 *Nimmer* §3.01

4    at 3-3 ("A work is not derivative unless it has *substantially* copied from a prior

5    work.  If that which is borrowed consists merely of ideas and not of the expression of

6    ideas, then, *although the work may have in part been derived from prior works, it is*

7    *not a derivative work.*") (emphasis added).

8         Because *Her* is not substantially similar to "Belvedere," any argument Plaintiffs

9    could make about *Her's* derivation is irrelevant to their infringement claim.

10   **IV.**    **CONCLUSION**

11        Plaintiffs' script "Belvedere" is not substantially similar to Defendant's motion

12   picture *Her*.  As a result, whether or not Defendant ever had access to "Belvedere" or

13   used it in any way in creating *Her*, Plaintiffs cannot establish a prima facie case of

14   copyright infringement.  No other allegations or facts can change the fundamental

15   dissimilarities between the two works.

16        Defendant respectfully requests that Plaintiffs' Complaint be dismissed with

17   prejudice in its entirety.

18

19   DATED:  February 27, 2014                    /s/ Daniel M. Mayeda
                                           _____
20                                         LOUIS P. PETRICH
                                           DONALD R. GORDON
21                                         DANIEL M. MAYEDA
                                           LEOPOLD, PETRICH & SMITH, P.C.
22                                         Attorneys for  Defendant
                                           Adam Spiegel, aka Spike Jonze
23

24

25

26

27

28